Next case is the Town of Normal v. Workers' Compensation Comm'n 411-0734. Counsel, please. Good morning, Your Honors. May it please the Court, Counsel. My name is Britt Eisele for the Town of Normal, the appellant in this case. There are a few issues in this case, but the most compelling one, I think, is notice. And I'd like to spend my time talking about the notice issue. The brief also discusses the other three issues, which is accident, causal connection, and permanency. But I truly think this hangs on the notice mostly. We have a 55-year-old utility worker, three, at Town of Normal, who had been working there for 32 years and injured his right elbow May 12, 2005. We eventually settled that case. That's not at issue in this case with regards to the elbow. We knew about it. He complained about it. What's at issue is something we didn't know about. And let me just read, if I could, these are the key portions, I think, from both the Commission's majority decision and the Commission's dissent. The Commission said, with regards to notice, now this has to do with the carpal tunnel, right carpal tunnel. With regards to notice, I'm sorry, I'm reading from page 11 of the Commission's decision. With regards to notice, it is apparent from the record that respondent was following the petitioner's elbow condition and thus had notice of petitioner's carpal tunnel syndrome diagnosis before any physician rendered causation opinions on the subject. Thus, because we knew about an elbow, we know about the carpal tunnel. And then flipping over to page 14 of the decision in the dissent, they criticized this. The dissent, or I should say arbitrator Lindsey, criticizes it saying the majority finding that the respondent was, quote, following the petitioner's elbow condition is not supported by the record. There is no evidence in the record indicating how and if respondent, the town of Normal, was following the petitioner's elbow condition. Secondly, even if respondent was aware of the petitioner's elbow condition and thus presumably was following his care, there's nothing in those records apprising respondent of work-related carpal tunnel accident injury or claim. Third, finding respondent had notice of an accident because it was following a course of treatment for another injury does not meet the requirement that claimant gave notice of the hand wrist accident to respondent. And going down it says, if anything, it establishes petitioner may have had two, may have told two of the respondent's supervisors he was going to have right elbow surgery, but that was all. He couldn't have told respondent he had a work-related carpal tunnel claim as it was not until April 17 of 06 that he wrote a letter to his doctor about carpal tunnel. And, you know, the only notice in the record I'll submit, I mean, I know counsel may argue that there are things in the medical records and I'll get to that in a minute, but the only thing in the record, in the transcript about notice is this little colloquy between our counsel for the town across examining Mr. Stephen Beale on C-65 to C-66 of the record. Who did you tell about your wrist and hand complaints? Answer, I stopped in at distribution and think Robert Miller and John was there. I mean, I told them I had to have surgery. Yes. Question, okay, and approximately when is it that you told them that you had to have the surgery? Answer, February of 06. And why do you recall it was February of 06? Because I was supposed to have the surgery and workers' comp stopped it until I saw Dr. Weiss. Question, okay, so you were supposed to have the surgery in February of 06, but you didn't? Right, on the elbow. All right. Did any doctor take you off work? I wasn't working, but I couldn't do anything with it. And what doctors did you see for your hand and wrist? Just told Dr. Nord and Dr. Weiss. Okay. So, again, he came in and this was after he retired, by the way. He wasn't working anymore for the town. His last day of work was June 23, 2005. And in February 2006, he just came in and told these two guys he was going to have surgery for his elbow. And somehow this is supposed to be bootstrapped onto this notice from the elbow is supposed to be bootstrapped as notice onto the hand. Counsel, what do you make of the statement? The respondent asked Dr. Weiss to evaluate whether the claimant's right-hand carpal tunnel syndrome could be caused by late deemployment. And Dr. Weiss examined the claimant on March 24, 2006, which was within 45 days of the date established by the commission as the manifestation date. So what is your response to that? Well, Dr. Weiss examined him and there was a report in March 31 of 2006. Is that what you're referring to? Well, it says that Weiss examined him on March 24 on the issue of the carpal tunnel syndrome. And the commission found that was within 45 days of the manifestation date, which would be the proper notice. Well, the report said he was asymptomatic for carpal tunnel syndrome. Okay. And later in a second exam report from Dr. Weiss, November 16, indicating Beal's carpal tunnel syndrome was an incidental finding. Well, he's asymptomatic. Obviously, though, in calling for the examination, aren't they aware that there is, in fact, an issue with regard to the carpal tunnel? You're saying there's no notice? That's right. So the notice we know doesn't have to be in some specific form, does it? Well, it has to be known. I mean, it has to be known. In other words, what happens, for example, if we take this reasoning, what happens if Dr. Weiss found that there was no foot fungus? Are we supposed to then know that he had foot fungus? No, I agree with you there, but why did the respondent then ask Dr. Weiss to examine claimant for carpal tunnel if there was no indication in the respondent's mind that there might be something about it? And I guess I'd ask, Your Honor, is it specifically in Dr. Weiss' report that he said he was looking at Mr. Beal for carpal tunnel? You're saying that Weiss did not examine his right hand for carpal tunnel? He examined his elbow. I mean, we knew about his elbow, and that's the whole thing. We knew about the elbow. I guess anything incidental that comes from that exam, we're supposed to know, even if there's not a finding of a problem, we're supposed to know about it. And that's the whole thing. I would point out to the Court, there are two cases that weren't cited in my brief, but I found them to be pertinent. There's a Supreme Court case called Keystone Steel and Wire v. Industrial Commission, case number 72. You just found them and you didn't cite them in your brief? I didn't cite them. Does opposing counsel know of those cases? This is an oral argument, sort of. Well, I don't think it's... Well, let me just say... What did Dr. Knorr diagnose on February 9? The right carpal tunnel syndrome was an old diagnosis. He diagnosed carpal tunnel syndrome on February 9, did he not? February 9, 2006? Right, that's right. He said it was an old diagnosis. Then why was Dr. Weiss addressing the question of carpal tunnel on March 24, 2006 if the employer wasn't aware of the Knorr diagnosis or a diagnosis of carpal tunnel? Why would Weiss even address it if he didn't ask for it? Well, I guess the speculation is that he must have addressed it because Dr. Knorr addressed it. Well, if Dr. Knorr addressed it and he addressed it, that's 44 days after the new date of manifestation, February 9. So it's within 45 days. So the notice is good. Well, the notice, insofar as we're supposed to define an old diagnosis for carpal tunnel is... In other words, any problem this man has is automatically noticed to us. Well, once the commission changes the manifestation date to February 9, 2006, if February 9 is the manifestation date and you're asking a doctor for an opinion as to carpal tunnel and he gives it to you on March 24, it would occur to me that you have some knowledge of carpal tunnel. Well, first, presuming that it is the February 9, 2006 is supposed to be the accident date. I'm a little unclear from the decision if it's that date or April 27, 2006. They allowed him to amend to make it February 9, 2006, the day that Knorr gave him the opinion. He alleged the manifestation date of June 23. That was his last day of training. The commission then says the date couldn't be the manifestation date since he was never diagnosed with carpal tunnel until February 9, 2006. You mean by Dr. Knorr? And they determined, well, he was the only one that looked at him on February 9. And then based on the record, the commission determines that February 9 is the date that became plainly apparent. That's the manifestation date. Well, to me, from my perspective, it's convenient. He's very convenient that the commission found that date. A lot of things the commission does are convenient, but the fact of the matter is they did it and there's a record to support it. I'm trying to follow your argument here. Are you now taking issue with the manifestation date, notice? What are you focusing on? Well, notice and the manifestation. I'm leading into manifestation and accident, I suppose, because obviously that triggers notice. And part of this is trying to figure out, I mean, I think I read in the decision that February 9, 2006 is the date of accident that the commission wants. But it could also be April 27, 2006, which was the surgery for the elbow. Well, sticking with one issue at a time, I understand you're arguing that there was no notice. So let's move forward on that. And you may have to respond to counsel's argument anyway. The law also provides, even if the notice is defective, missing, it's inaccurate, where is the prejudice to the respondent? So how is the respondent prejudiced here? Well, we didn't have a chance to look at this injury again before he got surgery. He ultimately needed surgery for the right hand  We weren't aware, just by watching what he did as a utility worker, that he had carpal tunnel. He never complained of pain in his hands. Unlike many cases where it's just the nature of the work, for example, something falling on a guy's foot, day after day after day, gives the employer notice that perhaps there was an accident. We don't know that he had carpal tunnel just because he was a utility worker. It prejudices us because we didn't have a chance to see him again after our doctors say there's nothing wrong with his hand. We don't have a chance to investigate. He gets the surgery. He comes to us to say that he gave us notice. He gave us notice somehow that he came in and reported his shoulder. I still think we have, I'm sorry, not shoulder, his elbow. I think we still have this elbow problem. We have to rely on the elbow notice in order for you to make the jump that, well, I guess with regards to speaking about it, we have to regard, we have to go with the elbow notice. But if you want to rely exclusively on the records for notice, then the medical records tell us that he didn't have a problem, but we should have known that he did. It's something, I think it takes a jump. It takes a jump from speculation to knowledge. We weren't prepared for that jump, and I don't think the Act is prepared to make that kind of a rationale for that jump. Thank you. Counsel, please. May it please the Court. My name is Laura Gray, and I represent Mr. Veal, the employee, and we do request this Court affirm the decision of the Commission and the District Court. I'm going to address the issue of notice. The counsel has indicated that notice is against the manifest way of the evidence, and we find it is not. Notice requires, the notice requirement is a purpose, is to allow the employer to investigate the alleged accident. Compliance with notice is found when the employer has possession of known facts of the accident within the statutory period. The facts are that within 45 days of the amended date of accident, February 6, 2009, Dr. Weiss, who was the Respondent's independent medical examiner, saw Mr. Veal, and that was March 24, 2006. And Mr. Veal told him on that date, my right hand and fingers have been placed in pain. The amended date of accident was February 6, 2009. Did I say 9? 2006. I wrote 9. And then Mr. Veal was examined on March 24, 2006. Thank you. Mr. Veal did indicate in that March of 2006, he was having complaints in his hands and his fingers. Dr. Weiss at that time, reviewing that report, also indicated that the EMG NCV test that he had done in January, indicated a finding of purple tunnel, a positive finding in the right wrist. So Mr. Veal also testified at a trial that he advised his supervisor at the city about his elbow injury. And the council provided some testimonies of what he said, but on page 30 of the transcript, but on page 29, right before that, it starts the conversation. I asked, did you advise the supervisors at the city of your elbow and wrist injuries? Advise them, he asked. Tell them. Yes, he told them. That's when he goes into, who did you tell? And when did you tell? He told them in February, and that was not disputed in this matter, that he told his employers that he was having hand complaints at that time. The commission found that adequate was noticed. That's all I have on the issues of notice. If you have any other questions regarding causation or I can address those too. Thank you. Yes, briefly. Thank you. It's interesting, that part of the transcript, page 29, is a leading question, isn't it? Did you ever advise your supervisors at the city about your elbow and wrist injuries? And the answer is, advise them, tell them. Tell them about, and he said yes. Who did you tell about your wrist and hand complaints? And he goes on to tell them about what he actually said, which is that he was going to have surgery to the elbow. So it is a leading question he's answering. But it's not him saying, yes, I told them about my hand complaints. I had hand complaints. In fact, he explains during his testimony that he never really had hand complaints that he discussed with his employer. And when counsel mentioned the case about the known facts, that we're supposed to have notice from known facts, what are the known facts? I mean, I guess we can talk about the speculation of what we knew, but what are the known facts? That he was going to have the surgery to the elbow? That he was getting examined for his hand that didn't show anything? Are we supposed to know from that, for example? I mean, everything is in the negative. He wasn't complaining about carpal tunnel. He didn't have carpal tunnel. He was examined for carpal tunnel. He didn't have it. So, I mean, if he were examined for, and I hate to bring this up, but for me, it shows the absurdity of the reasoning. If he was examined for foot fungus and he had no foot fungus, do we then know about a foot fungus injury? Or a foot fungus, you know, sort of thing? I guess we have to know something. And that's why it proves defective in this case, the notice. Thank you. Thank you, counsel. The court will take the matter under advisement. With this position, we'll proceed to the next case. Diana Warner, Against Focus Compensation Commission, 5-1-1-0-2-1-3. Counselor, please. Yes, good morning, your honors. My name is, and may it please the court, my name is Fritz Levenhagen. I'm representing Diana Warner in this case. It is a case involving right shoulder impingement syndrome resulting in surgery and right thoracic alvet syndrome. My client was a passenger tire builder at Continental Tire for a number of years before she developed symptoms involving her right upper extremity. She reported the incident to her supervisor. She underwent a course of conservative care and treatment, was examined by Dr. Wayne at the request of the respondent, a Section 12 examination. That initial examination of Dr. Wayne was conducted on October 25, 2005. Thereafter, she received further treatment from her own physicians and was examined by Dr. Milne on July 27, 2006. Section 12 examiners saw her then. She then saw Dr. Palletta on August 2, 2006. He diagnosed impingement syndrome and thought she may have thoracic outlet syndrome as well, referred her to a Dr. Thompson. She was approached by her employer telling her that she had to return to work full duty without restrictions on August 9, 2006. She attempted that and ended up in the emergency room, after which time the emergency room physician reinstated Dr. Palletta's restrictions. She remained on restricted duty. The respondent then tried to schedule another Section 12 examination with Dr. Milne, who had just seen her on July 27, 2006. I wrote a letter requesting that the exam with Dr. Milne be rescheduled for a later date, since the respondent had already had her examined on July 27, 2006, and nothing had changed since then regarding her condition. Then my client did see Dr. Milne on October 25, 2006, and after that we proceeded to trial, requesting that the benefits be awarded for temporary total disability for the period of time that she was off from work, from the date that Dr. Thompson took her off from work until she saw Dr. Milne, the arbitrator awarded those benefits. The commission took away the temporary total disability benefits because they stated that my client refused to attend the examination with Dr. Milne, when in fact she did attend it. It was simply rescheduled for a later date, and then took away the penalties awarded by the arbitrator for the nonpayment of that temporary total disability, and also took away the penalties that were awarded by the arbitrator for the failure to pay medical expenses relative to the shoulder surgery, which was not disputed. And that's my primary argument, Your Honor, that those medical expenses incurred at Dr. Paletta's office. From the date that he performed surgery, on March 8, 2008, she had right shoulder surgery. The respondent knew that the condition was related. At arbitration they conceded that the right shoulder condition was related. At Dr. Paletta's deposition on January 29, 2009, six months before arbitration, I moved to nonpayment of those bills in March of 2009. We went to arbitration. In June of 2009, the arbitrator received the bills that I submitted. They were admitted into evidence without objection. In response to my penalties petition, the respondent submitted a response saying that respondent's Section 12 examiner found that my client had impingement syndrome and needed treatment. There was no denial of the reasonableness or necessity of those bills. Yet, in June 2009, the bills are still unpaid. And didn't they contend that you exceeded the number of positions you were entitled to? Not at arbitration, Your Honor. They brought it up for the first time on review before the commission. The commission, in its decision, interestingly, states  that they were raised on appeal and they specifically remarked in the majority's opinion, while the commission concludes that the respondent waived the choice issue at arbitration based on its failure to object to any of the medical expenses, waiver was a contested issue on review. The record does not permit the commission to conclude that the respondent acted in an objectively unreasonable manner in challenging its liability for the shoulder expenses. Well, let me ask you a question. If the respondent relied on the two-physician rule in refusing to pay those medical bills but then didn't raise the two-physician issue at arbitration, they've clearly forfeited the issue of the two-physician issue at arbitration on the ultimate award, but does that make their refusal to pay based on that unreasonable? Why? They didn't forfeit that. Well, they said that was their reason and the commission bought it. Well, the commission didn't buy it, though. Yes, they did. They didn't disallow the medical expenses because there was weren't unreasonable in withholding the payment because of that reason. They believed that the issue was raised at arbitration, but they used the opinion this issue, the two-physician rule, as a basis for the denial of the penalties. Exactly right. Because that's viewed from the point of view of the employer at the time the denial is made, not whether they have waived the question. It's not waiver anyway, it's forfeiture. They've not forfeited the issue on review for failing to raise it at arbitration, but that has to do with the payment of the bill, not the penalty. Well, and it would be an objective reasonableness standard. Yeah, and if the employer believes that the employee has exceeded the two-physician rule and justifiably believes it and refuses to pay the medical bill because of it, you can't award penalties for that, can you? Well, yes, you can. How can you? On what basis? Because they would have to show some objectively reasonable basis for believing that that was an issue. Now, what does the forfeiture have to do with what happened earlier? No, no, no. Why was it objectively unreasonable for them to believe that the employee had exceeded the two-physician rule? Why was that objectively unreasonable? Because it was never an issue. No. Doesn't that reflect that perhaps the employee did exceed the two-physician rule? Or at least an argument could be made of that? Yeah, we can see that after hearing that. Well, if that's true, then it wasn't unreasonable for them to believe it. And if it wasn't unreasonable for them to believe it, there's no penalties. Suppose the commission, the respondent has a section 12 examiner who says no causal And the commission ultimately says, I give no credibility. We give no credibility to that report. Couldn't they have still relied on it, though, in refusing TTV? What's the difference between that and this kind of situation where ultimately the commission finds that the issue's forfeited, however, it's not unreasonable for them to rely on it at the time? The difference I would make is that it's a year and a half or more since the bills were originally incurred. It's after all the examinations have taken place, after the surgery's been performed, after the bills have been submitted repeatedly, without objection, without any objection from their counsel. No hint of any thought about there being any problem with the choice of physician. After the decision is rendered, then here comes the idea that perhaps we can raise the second choice rule to get out of paying for the penalties. Well, I think that the McMahon court indicated that you have to, if there's got to be some, there should not be an unreasonably, let's say, just delay in the payment of medical bills. And here is a substantial delay. But that's circular logic. That presupposes they didn't have a reasonable basis to refuse to pay. Now, you know, Justice Stewart's example is the easiest example in the world. You don't pay the medical bills because your IME says don't pay them, and four years later the commission says you owe them, and no penalties. You rely on your IME. You weren't paid for four years. I mean, the delay has nothing to do with it, really, on the question of at the time that they refused, could they have justifiably believed that the employee had exceeded the two position rules? Well, put it another way. You can't judge what happens after that as a reason that they, you know, to look at the issue at the time that they denied the payments. Your argument can not consider forfeiture and other things. Well, this is a novel issue that I've encountered in a way with regards to the delay because I had no explanation from my client for any of the doctors, for that matter, for why the bills are still outstanding when they're being admitted without objection. So it is surprising. Be that as it may, I would still argue that my client's request that the examination with Dr. Milne be postponed to a later date, and she attends the examination. This is the third Section 12 examination that she's going to attend. I request that it be postponed for a few months. It is. She attends it, and yet she has not paid her temporary total disability benefits for that period of time. The respondent could have said, we are refusing to pay your client's benefits because we insist that she go to this exam. We want another exam right now. Instead, it's, can you reschedule it? And then, yes, they do. They do reschedule it. So there was never any refusal on my client's part to not attend the examination with Dr. Milne. She had already seen Dr. Milne once. She had also seen Dr. Wayne once. She never refused to attend an exam. She simply requested that it be rescheduled. In its decision, the Commission notes that my client testified at trial that her father was ill, and that's why she requested that I reschedule it. In my letter, I didn't say that her father was ill. I didn't think it really mattered. From my perspective, it was. I think the problem is, the problem they had with your letter, that you said her condition hasn't changed, but in the meantime, she'd been diagnosed with thoracic outward syndrome, and in fact, three days after the date for the proposed IME, she had surgery. Yes. Which then made it difficult for their examining physician to determine what her condition was because she'd already had the surgery. Yes, and I understand that. The doctor that examined her, Dr. Milne, was a shoulder specialist. He really could not give an opinion on thoracic outward syndrome. The fact that he saw her before, her symptoms had not changed. She had the same symptoms when she saw him as when she saw Dr. Paletta, and when she saw Dr. Thompson.  That's the trouble the commission had with it. Yes, I understand that, and my point simply is that she did not refuse. It was rescheduled. She attended, and it's our position that she would be entitled to those benefits as well. And I'd request that the commission restate the decision of the arbitrator as I indicated in my brief and throw that over to you, if that's just and proper. Thank you. Thank you. Counsel, please. Your Honors, Mr. Levin. My name is Sherilyn Trevaya. I represent Continental Tire in this case. With regard to the issues that were brought up by Mr. Levin-Hagan, certainly the TTD issue was a conflict of evidence between Ms. Warner's testimony and how they viewed the correspondence that came from Mr. Levin-Hagan's office that specifically said she wasn't going to attend. That's within the province of the commission to make the decision. They relied on the letter. They found that she refused to attend the IME, and so that should be affirmed. With regard to the penalties, the one thing that wasn't brought up by Mr. Levin-Hagan that I wanted to place before this court was he makes it sound like this was never an issue, and indeed it was, and that was part of the problem we had in front of the commission because in these cases, after you've had the arbitration hearing, you submit proposed decisions, and the proposed decision that we submitted had the two-position rule information in it, and we explained that to the commission, but because those are only sent to the arbitrators and not to the commission, it's not a part of the record, and we can't put anything in the record when we get to the commission because we're precluded by Section 19B. So that was kind of the quandary that we were in, and so I do take some offense to the fact that Mr. Levin-Hagan's stating that we never brought this up until the case went up on appeal to the commission because certainly that is not the fact. At the time that the bills were going unpaid, did you send a letter or anything saying you exceeded the two-position rule? No, we did not. The first time it came up was in the proposed decision. It was set up before the arbitrator. Correct. But with this case, it was very clear, and that was kind of why we had a cross-appeal on this issue, and it involves the commission's finding that we waived the two-position rule because we're basically dealing with a statute that sets forth what we are required to pay. We have to require everybody who's the first position, everybody in that chain, second position, everybody in that chain, emergency room. And then once you get beyond the chain, it's only allowed if it's agreed to. And that's a statute. That is a statute that is set up to say, you know, this is a balance of the petitioner and the respondent. You're going to have to pay this, but we're going to limit you to paying only this. And that's exactly what gets talked about when you talk about the balancing of interest in this case. And so I guess the problem that Connell-Tyer had with the finding of waiver, which you've classified as forfeiture this morning, how do you waive an absolute right set forth in the statute? She initially treated with Dr. Byler. She went to him. He was a company doctor. But she kept going back and treating with him. It wasn't like a one-time thing. She then gets treatment with Dr. Neal. She says she wasn't referred there. Her third doctor is Dr. Scott. PA Markley sends her to Pauletta, who sends her to Thompson. Four and three. And I guess the question is, how do you waive that when the statute says? It's forfeiture. It's forfeiture. If you don't object to it at trial, then you forfeit the issue. I mean, and that's true of just about everything that happens. I mean, you have a right to not have a case decided on hearsay evidence. But if you sit there and don't object when hearsay is introduced, it comes in. But hearsay isn't a statute. That is a specific right and a limitation set forth in it. What I'm hearing from this court, and correct me if I'm wrong, is that when we go to hearing, we're supposed to say to the arbitrator, we want you to apply every statute that's written in the act verbatim. Because that's what this is. When the medical bills go in for doctors that were seen, that the claimant saw after he exceeded the two-position rule, there would be an expectation that you would object and say, those shouldn't be admitted because they're beyond the two-position rule. We shouldn't have to pay them. If you don't do that, it's forfeiture. Quite frankly, there is a body of law that supports that. There are cases that say the employer waived the issue of the commission's calculations of the employer's average weekly wage. If they decide relevant authority, the employer forfeited the issue of the employee's entitlement to additional TTD by not contesting the issue at the hearing. I mean, there is a body of case law that says you can't forfeit these rights. It isn't a new and novel approach I think we're taking. Well, there's an equally prominent body of law that basically says that waiver requires a voluntary and intentional relinquishment. That's why I'm talking about waiver. It's forfeiture. We're not talking about waiver. Well, they did. They're wrong. Well, I know, but that's what the commission calls it. Yeah, but we affirm them for any basis in the record. I mean, it's forfeited. It's not waiver. It was forfeited. I mean, unfortunately, if you look through all the court decisions, the words waiver and forfeiture are used interchangeably at times when they shouldn't be. Well, I won't take any more of the Court's time to figure out the issue. Clearly, you've made your decision, and that's fine, and I won't continue to argue it. The only other issue that we did raise in the cross-appeal was the finding of TOS, and that was based on the fact that she'd seen seven doctors before then, none of which found that she had it. It should have been a four- to six-week recovery. Clearly, it was not. It was over a year. And then when all is said and done, when she's finished, she's still complaining of the same stuff she was complaining about before. So we don't really think that that is unreasonable to find that against the manifesto of the evidence. And that's all I have. Thank you, Counsel. Yes, in regards to the Bradshaw Syndrome, Dr. Bradshaw examined the petitioner and found that it was related to her injury and the treatment Dr. Thompson provided was appropriate for that condition. That's all I have. Thank you, Your Honor. Thank you, Counsel. The court will take the matter under advisement for disposition and reset until 1 p.m.